Good morning. May it please the court, Thad Blank from the Federal Defender Services of Idaho on behalf of Appellant James Burrow. The district court here assumed without deciding that the bail bondsman was acting as a government agent when he conducted the entry into Mr. Burrow's home, that's at issue. Therefore, the issue before this court... Did he actually say that? He did. It's on the final page of his order that he's not reaching that issue. So assuming without deciding that Mr. Rattigan was acting as a bail agent, he held that the search was, or that there nonetheless was no search that created a Fourth Amendment issue. Well, I guess let's just sort of jump to it. Your guy jumped bail and that it was the bail bondsman that came out and found the gun, right? And so even if we assume Mr. Burrow didn't feel like he had a choice about whether to let the bondsman enter his house on the day of the search, didn't Mr. Burrow have a choice about whether to let him enter and search his home when he co-signed the bail bond agreement? And so why doesn't that agreement constitute sufficient consent to the search? Well, the Supreme Court case law and this Court's case law is clear that private contract between parties is not consent to a search by a government agent. It's not something that the government can rely on. Well, I don't think this is, you rely on Bumper, right? That's one of the cases. I just don't see Bumper as, you know, Bumper to me is really concerned with the government using the show of its own authority to conduct unlawful searches. And you know, I guess I don't see that as the same situation. So what is your best case for your argument that Bumper applies to all searches conducted pursuant to a claim of right to enter the property? Well, I guess the other cases that we cite that support that proposition are Korngold and also Walther. In Korngold, there's a tariff agreement that's between the airline and the private party. And the court says, in fact, the airline agent calls and says, checks, you know, would this allow me to get into the bag? The agents are asking me to get into the bag. And the court says, that doesn't matter. That's not the question. That's not an independent basis that justifies the search. And in Walther, which is that foundational case on agency, there's, I believe, a federal regulation that the searching party believes authorizes them independently to get into the container. And that's not an independent basis. Well, I guess I just see the way that you're asking us to read Bumper as, you know, let me hypothetically say or even state that there's an argument that there's no show of authority and that there was a claim based on a contractual right. And so applying Bumper to mean that any entry or search based on such a claim of right constitutes a search based on a lawful show of authority, in my view, would be an unprecedented expansion of the circuit's Fourth Amendment jurisprudence. I mean, I'm thinking you're asking us to go where no one's gone. Well, I don't cite a case that is exactly square in combining these two doctrines, but it's not a step beyond either of those. Bumper defines coercion as when a person doesn't think they have the ability to refuse the search and then it's well established. But he liked it just fine when he thought he could get out of jail on a bond and then he was willing to submit to a search for that and then he skipped bond, right? And so then the bondsman's there, you know, I'm not sure, do we have to assume that he was acting as a government agent? I mean, can't we assume from here that he wanted to get his money back? Because if he brings it back in, then how much money were they out? Ten thousand bucks or how much? Twenty thousand. Twenty thousand. And one small factual clarification. It wasn't Mr. Burrow who skipped a bond. He was a co-signer on the bail bond application for his brother. I'm not sure that that's material to the question that you're asking, but. Okay. Um, so I guess the other, the other, um, the foundational case really is Stoner v. California and that's a case that holds that a contract or state property law that allows a hotelier to go into a guest's room. That's not something that the police can rely on. That doesn't allow them to circumvent the Fourth Amendment requirement. Let's assume for a moment that, uh, that he was working. What's his name? Um. Mr. Burrow. No, not Mr. Burrow. Mr. Radigan. Mr. Radigan was assisting the police. What was the police officer's name? Uh, Don Davenport. Yeah. Um, on the date, on a few dates, let's say on the date of this search, where they find Mr. Burrow or where they find Mr. Cohagen. Okay. Right. Could it be said that, that he was out there both for the purposes of helping the police get evidence about a gun, additional new evidence about the gun, as well as, hmm, maybe Mr., maybe Mr. Cohagen might be there as well? Your Honor, so. So sort of kind of a mixed motive kind of thing? Mixed motive, whether he had a couple responses. One is that's not the premise of the district court's decision. No, I know, but I'm just asking. Is there evidence to support that? Yeah. I think, I think the district court has to decide that, and I don't. You say that's a factual question. That's a factual question, and I don't think we're guaranteed to win on a remand by any means, but I think we certainly have an argument. Well, what if the district court were to find that he had both motives? Um. What happens? I think that doesn't automatically mean we lose. We're fighting an uphill battle. I think Walther points to two factors, whether there's direction, whether the government is directing the particular search, and then second, whether there's a legitimate independent purpose. But for instance, Korngold says even if there was a legitimate independent purpose in this particular search, it wouldn't matter because the degree of the government agent's involvement in the search was so significant that it, that it would still. How would you characterize the degree of the, of the government's, of the officer in this search? Our position would be that, that the reason Mr. Rattigan decided to go out there on December 31st was he wanted to help out Detective Davenport. That he. For what reason? To ingratiate himself with, with Canyon County Sheriff's Office is what it appears. I'm not saying that the district court made that finding, that it will necessarily make that finding, but there's, there's evidence of very close collaboration that we think requires the district court to make. And what is that evidence of close collaboration? That the same day he gets a phone call from Detective Davenport, Mr. Rattigan goes into the office, signs a declaration, later gets a phone call that it's not going to work out, goes out twice, leaves voicemails to Detective Davenport that have nothing to do with any independent purpose. They're only for the benefit of Mr. Davenport's information. He leaves it after a first visit when he's unable to get into the house, and he leaves it immediately after the second visit when he's, when he's going to get into the house. One other thing that I, I would point out in the legitimate independent purpose prong is, Mr. Rattigan actually testified that he didn't want to get into the bathroom where Mr. Burrow was found. He says, I didn't want to get in there, one, because it was barricaded, and two, because I was afraid Cohagen was in there. So I'm not sure exactly what the district court will do with that evidence. There's contrary evidence in the record, but if you take it at face value, it's, it's a statement that the purported legitimate independent purpose isn't there. That's on page 192 of the record. When did he find Cohagen the final time? Was he outside the bathroom? I, I, I believe that the SWAT team found him inside the bathroom. Oh, after they came in and raided it. He didn't find him there? Correct. Mr. Rattigan never found him. It was the SWAT team which executed the search warrant early in the morning of the following day or late that same night. All right. So there's, there was, I think I read someplace where, where Davenport at one point tells Rattigan, you're not our agent. Right. What do we do with that? Well, how does that fit into this? I think it's, it's part of the factual issue that the district court has to resolve. There's, you're not our agent, and there's, you're not our agent, wink, wink, we know you're going back out there, and the district court has to decide whether this is an implicit agreement. I, I would agree that there's not evidence in the record for the district court to conclude there's an explicit agreement between these parties, but our position on remand would be that there's an implicit agreement and no real legitimate independent purpose. That the reason that Mr. Rattigan is going there on December 31st and making those phone calls is because he wants to help out the Canyon County Sheriff's Department. And I see that I'm almost out of time, so I'll, I'll save my remainder if I can. Thank you. May it please the court, Chris Atwood, appearing for the District of Idaho U.S. Attorney's Office. Because the court's deciding whether a private party perpetrated a Fourth Amendment violation, the court should apply the two-part test set forth in United States v. Miller. That requires first that you look to whether or not there was an unreasonable intrusion on the secondly, whether or not there was the private party's conduct amounted to government conduct. In this case, the district court held that there was no unreasonable intrusion into the privacy of the defendant. The district court did not reach and specifically did not reach the second question of whether or not the bondsman was a government actor. And so we, we disagree with the counsel's statement that the court assumed for the purposes of the analysis. In fact, the court specifically stated that the court need not reach the question of whether Rattigan acted as an instrument of the government. What the court did is it, it found on the first prong, and so it found it didn't have to reach the second prong. Basically, the court said he invited Rattigan in, right? That's correct. The district court analyzed the first prong and said that there was both a valid consent, and that was the district court's finding, which is entitled to deference, unless clearly erroneous. Consent was because of the agreement on the bail bond. The agreement in the bail contract as well as consent at the time of the search that day. Well, that's, okay. That seems to reach when the guy signed a contract that somehow, oh, he invited him, and he's an old buddy. Right. I agree with the court. The bail contract was the primary consent, and the parties reaffirmed that on at least no less than six occasions, as the district court found, he'd been back six times to search for the fugitive in the residence, and he came back that day as well. In your view, it makes no difference whatsoever if Rattigan was not working on behalf of the detective? It makes no difference if Rattigan was working for the detective? Yeah. It does. No, I think the court could still have pulled the search even if he was, but first of all, I'd point out- Doesn't that change the analysis, though? No, Your Honor. Even if he was a government actor, which I would suggest the district court didn't reach that question, and the facts point strongly in the opposite direction, even if he was a government actor- Well, why was Rattigan calling death important, letting him know what he was up to? Well, he was merely- He was just being a- He was reporting criminal activity, and I don't think that there's anything wrong with that. He contacted the detective Davenport and reported to him what he had seen, that citizens are entitled to, as long as they're working within their independent motive. But Davenport told him that the first piece of information wasn't good enough for Warren. So, I guess, is Mr. Rattigan's intent in requesting to enter Mr. Burroughs' home at the time of the search necessary to our analysis? And also, in other words, what I'm saying is, does it matter whether Mr. Rattigan intended to search for the fugitive or to see if Mr. Burroughs still had a gun in plain sight or do both? The consent does matter, and he can do both. Cleveland says that you can have a dual motive. And so, in this case, the district court found specifically that he did not exceed the scope of his consent, which was to go there to search for fugitives. The undisputed evidence in this case is that he went there to search for a fugitive. The district court made that specific finding. Even if he had a secondary motive, the Cleveland case that we've cited says it doesn't matter. As long as you're working within your independent motive, any sort of secondary or alternative motive to help law enforcement, it just doesn't matter. Well, is it a little bit like the taillight being out? If the taillight's out, it doesn't matter that you'd also like to search the car, but the taillight's out. I mean, there was an argument before the court said otherwise. It would say, well, if you really were stopping someone because you wanted to search the car, then that wasn't okay. You couldn't have a pretextual reason. But the law basically is if the taillight is, in fact, out, you can stop someone. And there is no pretextual reason here. It's undisputed that the ball bondsman and his employee had a $20,000 interest in locating that fugitive. That's why they had been to the residence six times before, and they had this contract that allowed them to do that. So the fact that they had to bring them in, or they lose $20,000. That's correct. And the district court specifically found that the bail bondsman did not exceed the scope of his consent when he went there. There's, again, no evidence otherwise. The suggestion that it was sort of a wink and an odd is just simply not supported by the facts. And, again, the district court's finding on these issues are entitled to deference unless it's been shown that there's – and there are no facts. I mean, I think counsel can see – I can't point to any facts that the district court could have made on that point, but there was consent. He was within the scope of that. I don't understand if the district court didn't delve into the government agent issue why you can say there's no evidence of a wink and an odd. There was not direct evidence, of course, but there was the circumstances counsel outlined in terms of the and so forth. Couldn't the district court infer from those circumstances that Rattigan was trying to please the detective and that, as a bail bondsman, it could naturally inert to his benefit to have a good relationship with the sheriff's office? I think the court would have to make some significant assumptions to get to that point. And I would note the court's correct that the district court specifically did not rule on the issue of whether Rattigan's contact amounted to government contact. But the district court did point out some undisputed facts, and they inevitably point to the conclusion that he wasn't a government actor. For instance, he held the officer didn't request that Rattigan go back to the residence. He didn't tell him to report any additional criminal activity. He didn't ask him to contact him if he learned of any additional criminal activity or information about the defendant. Instead, he told him, you're not our agent, and if you come across any additional criminal activity, you can report that if you choose to do so. And you also told him previously, though, that the first statement was inadequate, wouldn't support a warrant. Stale information. Sure, but any time someone talks to law enforcement and they say, thanks for the information, we're not going to act on it, then that doesn't mean that. And if you happen to find any additional information, give us a call. Further, the undisputed testimony by the bondsman, by Mr. Rattigan, is that he actually went back on December 31st because he had talked to a colleague, and he felt strongly if he went back on New Year's Eve, the same day that he had reported this to law enforcement, if he went back to that night, he would find the defendant either getting ready to go out to a New Year's Eve party or on his way out to a New Year's Eve party. You mean he would find the fugitive? Fugitive. Corhagan. Additionally, the conduct of the law enforcement agents in this case was much less than Miller or Cleveland. They didn't go with him to the residence. They weren't sitting there doing surveillance with binoculars. They didn't give him any equipment. He didn't even give him his cell phone number and ask him to report anything. Rather, Davenport, the law enforcement agent, went on vacation for the New Year's holiday, and six days later, he came back and found out that Rattigan had reported some information, had left some messages on his desk phone. I mean, the facts show essentially that law enforcement did everything right. They didn't ask the bondsman to go back there. And again, I think all these findings of fact and undisputed evidence leads to one conclusion, and that is there was no government action. So as you're reading of the district court statement that Burrough asked Rattigan if he would like to come in and look around, that all Rattigan did was show up and then not say, I want to come in or whatever. He just showed up. And so Rattigan, I mean, Burrough, then that's the invited-in predicate. Is that your reading? That there was no other interaction? He just showed up? Your Honor, the record shows that he showed up and knocked on the door. There were other occupants in the residence. They let him in. And when Mr. Burrough, the defendant, came out, he stated to him, you want to come in and look around? Go ahead. And he did. So there was no show of authority, hey, I'm here, pursuant to that he just showed up and told him to go ahead and look around. But again, we think the most important consent in this case actually was that prior written contract. No, I understand that. I understand. I'm just rereading the district court's statements and findings. We also see this case as actually different and distinct as Bumper. And we don't think Bumper applies because in Bumper, there was an invalid search warrant that was the basis for the later consent. And after the search warrant was found to be invalid, they said, well, the consent that she gave, that the grandmother gave pursuant to that search warrant is invalid. That's not a valid consent. In this case, there is a valid consent. That was the contractual agreement that allowed him to go in to search. So even if he showed up at the time, even if he would have said, hey, I'm here to search pursuant to that, even if you found that consent was not valid, there is still a valid consent that allows them to go in. The government What if there's a mixed motive? What's your response on that in case site? The Cleveland case is directly on point in that saying that there's a dual motive is okay. In that case, the electric company employees went to the property pursuant to a customer service agreement, and the court found that they weren't exceeding the authority of their customer service agreement. So that dual motive is okay. And I cite that in my brief. I can get the court the case for that. In closing, the government thinks that this is just like the Miller and the Cleveland case in that the law enforcement officers had no basis to tell Rattigan he couldn't go back. He had a $20,000 interest in obtaining and finding that fugitive. So the officers had no he wasn't doing anything illegal or improperly. They had no basis to tell him he could not go to the residence. So the government asked the court to affirm the district court's findings. Thank you. Okay. A few brief points in response to Judge Fisher and Judge Callahan's question. The question of the motive that Mr. Rattigan had when going there is relevant. I disagree with the government that the district court made a finding as to what his particular motive was on that day. That's the factual issue that has to be resolved. Reading the factual findings, it's just a recitation of what actually happened. But our theory of the case is there was an implicit agreement, and that turns on some credibility determinations in the broader context of this exchange that the district court gets the first chance to look at it and has to. And then just the general point about the bumper case. If Dave and Port had gone to the door with Mr. Rattigan and without a search warrant and said, I'm going to just follow you since you have a right to go be there because of the fact of this parole agreement, that would clearly violate the fourth agreement. It's no different given that Mr. Rattigan, for the purposes of this hearing, were assuming that he was acting as a government agent. For the same reason that Dave and Port couldn't go in there with him, Mr. Rattigan couldn't do it alone relying on that authority. That's one small inferential step beyond the situation in Bumper v. North Carolina. So remand is appropriate. Thank you. Okay. Thank you. Thank you, counsel, just in case. The matter is submitted.
judges: Fisher, Paez, Callahan